

FILED _____ LODGED
_____ RECEIVED

**FEB 05 2016**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

  Plaintiff,

    v.

DANIEL SETH FRANEY,

  Defendant.

NO. *MJ16-5022*

COMPLAINT FOR VIOLATIONS

BEFORE, United States Magistrate Judge, Karen L. Strombom, Tacoma, Washington.

  The undersigned complainant, Joseph C. Deaver, Special Agent, Federal Protective Service, being duly sworn states:

## COUNT 1
### *(Unlawful Possession of Firearms)*

  On or about September 28, 2015, at Tukwila, within the Western District of Washington, and elsewhere, DANIEL SETH FRANEY, who was subject to a court order meeting the requirements of Title 18, United States Code, Section 922(g)(8)(A)-(C), in the case of *Amanda Kienast v. Daniel Franey*, case number 140P381, in the Nineteenth Judicial Circuit Court of Lake County, Illinois, did possess, in and affecting commerce, firearms, namely, a Glock Model 22 .40 caliber pistol, bearing serial number KMD480;

COMPLAINT - 1

1   and a Glock Model 23 .40 caliber pistol, bearing serial number KHZ682, both of which

2   had previously been shipped and transported in interstate and foreign commerce.

3       All in violation of Title 18, United States Code, Section 922(g)(8).

## COUNT 2

### (Unlawful Possession of a Firearm)

6       On or about October 26, 2015, at Olympia, within the Western District of

7   Washington, and elsewhere, DANIEL SETH FRANEY, who was subject to a court order

8   meeting the requirements of Title 18, United States Code, Section 922(g)(8)(A)-(C), in

9   the case of *Amanda Kienast v. Daniel Franey*, case number 140P381, in the Nineteenth

10  Judicial Circuit Court of Lake County, Illinois, did possess, in and affecting commerce, a

11  firearm, namely, an AK-47 style Romarm-Cugir Model PM-65 7.62 x 39 mm assault

12  rifle, bearing serial number 1979-ZG3795, that had previously been shipped and

13  transported in interstate and foreign commerce.

14      All in violation of Title 18, United States Code, Section 922(g)(8).

## COUNT 3

### (Unlawful Possession of a Machinegun)

17      On or about October 26, 2015, at Olympia, within the Western District of

18  Washington, and elsewhere, DANIEL SETH FRANEY did possess a machinegun,

19  namely, an AK-47 style Romarm-Cugir Model PM-65 7.62 x 39 mm assault rifle, bearing

20  serial number 1979-ZG3795.

21      All in violation of Title 18, United States Code, Section 922(o).

## COUNT 4

### (Unlawful Possession of Firearms)

24      On or about November 12, 2015, at Pierce County and Yakima County, within the

25  Western District of Washington and the Eastern District of Washington, DANIEL SETH

26  FRANEY, who was subject to a court order meeting the requirements of Title 18, United

27  States Code, Section 922(g)(8)(A)-(C), in the case of *Amanda Kienast v. Daniel Franey*,

28  case number 140P381, in the Nineteenth Judicial Circuit Court of Lake County, Illinois,

COMPLAINT - 2

1   did possess, in and affecting commerce, firearms, namely, an AK-47 style Romarm-Cugir

2   Model PM-65 7.62 x 39 mm assault rifle, bearing serial number 1979-ZG2045; and a

3   Colt Model AR-15 5.56 mm assault rifle, bearing serial number 4378629, both of which

4   had previously been shipped and transported in interstate and foreign commerce.

5        All in violation of Title 18, United States Code, Section 922(g)(8).

6   **COUNT 5**

7   *(Unlawful Possession of Machineguns)*

8        On or about November 12, 2015, at Pierce County and Yakima County, within the

9   Western District of Washington and the Eastern District of Washington, DANIEL SETH

10  FRANEY did possess machineguns, namely, an AK-47 style Romarm-Cugir Model PM-

11  65 7.62 x 39 mm assault rifle, bearing serial number 1979-ZG2045; and a Colt Model

12  AR-15 5.56 mm assault rifle, bearing serial number 4378629.

13       All in violation of Title 18, United States Code, Section 922(o).

14       And the complainant further states:

15  **A. Introduction.**

16       I, Joseph C. Deaver, am a Special Agent with the Federal Protective Service

17  ("FPS").  I have been employed by FPS in a law enforcement capacity for approximately

18  twelve years. More specifically, I served for five years as an FPS uniformed police

19  officer and for the past seven years as a Special Agent. Since August 2014, I have been

20  assigned to the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force

21  ("JTTF"), Seattle Division, in Tacoma, Washington.  At the JTTF, I work with a team of

22  federal, state, and local law enforcement agents and officers on investigations relating to

23  domestic and international terrorism.  As a result of my training and experience, I am

24  familiar with tactics, methods, and techniques used by terrorist organizations and their

25  members, and by individuals seeking to join or engage in acts on behalf of terrorist

26  organizations.  I have also conferred with other FBI Special Agents and FBI JTTF Task

27  Force Officers who have expertise and experience in counterterrorism investigations.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The facts in this affidavit come from my training and experience, and information

2    obtained from other agents, detectives, analysts, and witnesses.  This affidavit is intended

3    to show that there is sufficient probable cause that the defendant committed the offenses

4    charged above, and does not set forth all of my knowledge about this matter.

5    **B. Background on Daniel Franey.**

6    Daniel Seth Franey is a U.S. citizen who currently lives in Montesano, Washington.

7    Franey has lived in Western Washington for approximately the past three years.  Franey

8    occasionally works as a commercial fisherman in Westport, Washington.  Franey lives

9    with a female partner and their two young children.[1]  He also has children with another

10    woman who lives, along with those children, in a different state.

11    According to records obtained from the U.S. Army, Franey served in the Army from

12    approximately October 2002 through October 2008.  During his time in the Army, Franey

13    served as, among other things, a Patriot Missile Launching Station Enhanced Operator

14    and Maintainer, and he was stationed at Air Defense Artilleries in Texas and Korea.

15    While with the Army, Franey received training and experience using a variety of

16    firearms.  Franey was officially discharged from the Army in or about October 2008.

17    Franey recently has told various associates, including an undercover officer, that he

18    "deserted" the Army.  Records obtained from the Department of Defense are consistent

19    with Franey's comments.

20    Based on this investigation, I am aware that Franey is not legally entitled to

21    possess firearms.  Specifically, I have obtained and reviewed court records from the

22    Nineteenth Judicial Circuit Court of Lake County, Illinois, related to the case of *Amanda*

23    *Kienast v. Daniel Franey*, case number 140P381.  The Court in that matter, on May 5,

24    2014, issued an Order of Protection against Franey that meets all of the requirements set

25    forth in 18 U.S.C. § 922(g)(8)(A)-(C), and therefore prohibits Franey from possessing a

26

27    _____

28    [1] Franey is not legally married to his partner, although he often refers to her as his "wife."
Because Franey regularly describes his partner as his "wife" during conversations described
herein, this complaint also uses that term to describe her, although they are not legally married.

COMPLAINT - 4

1  firearm under federal law.  Specifically, the court documents establish that, as required by

2  § 922(g)(8), Franey received advanced notice of the hearing via personal service; the

3  Order of Protection restrains Franey from harassing, threatening, and stalking his former

4  intimate partner (his former live-in partner who is also the mother of Franey's children);

5  and the Order prohibits the use and threatened use of physical harm and bodily injury

6  against the former intimate partner and the children.

7  **C. Initiation of the Investigation.**

8  In April of 2015, Witness 1 contacted the Grays Harbor County Sheriff's

9  Department to report a confrontation he had with Franey.  According to Witness 1, he/she

10  had known Franey for approximately two and a half years prior to this incident.  By way

11  of background, Witness 1 explained that Franey regularly talked about his support for the

12  designated foreign terrorist organization of the Islamic States of Iraq and the Levant

13  ("ISIL"),[2] and claimed he wanted to go overseas to "join the fight."  According to

14  Witness 1, Franey also consistently talked about his desire to kill Americans, and has said

15  that he "loves Allah" and would gladly give up his wife and family for Allah.  Franey has

16  told Witness 1 that he wants to travel to Afghanistan to kill American soldiers, and that

17  all non-Muslim Americans should be killed.  According to Witness 1, Franey in the past

18  had repeatedly tried to convince Witness 1 to sell Franey a gun.  Franey was particularly

19  interested in obtaining Witness 1's AK-47.  Witness 1 refused to sell a firearm to Franey,

20  and eventually Franey stopped asking after Witness 1 told Franey he no longer had the

21  AK-47.  Franey told Witness 1 that he (Franey) was not legally allowed to possess

22  firearms and that he believed he was not permitted to travel outside of the United States.

23  According to Witness 1, on April 6, 2015, Franey was at Witness 1's house and

24  began talking about ISIL in an aggressive manner.  Franey stated that if Witness 1 was

25  not with ISIS then he/she was against them and would be killed.  Franey claimed that

26  Americans go overseas and rape and kill women, and Franey again talked about wanting

27

28  [2] Franey regularly refers to ISIL as either the "Islamic State" or "ISIS," both of which are common aliases for ISIL.

COMPLAINT - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   to kill Americans.  Franey told Witness 1 that he/she should fly an ISIS flag at their

2   house, and became increasingly agitated and clenched his fists.  Witness 1 told Franey to

3   leave his house, but Franey instead moved towards Witness 1.  Witness 1 went inside his

4   house, grabbed his shotgun, and ordered Franey to leave.  Franey did not leave the area

5   until Witness 1 called the police.  Another witness was also present for this incident, and

6   corroborated Witness 1's account.

7        During 2015, several other witnesses provided similar information to law

8   enforcement.  For example, Witness 2 reported that Franey regularly espouses radical

9   rhetoric and has stated that he "needs to go kill Marines because they are raping women

10  and killing them."

11       Similarly, Witness 3 reported that Franey has talked about "women and children

12  being raped and brothers being murdered."  According to Witness 3, Franey further stated

13  that the U.S. and Iranian governments were corrupt and that he would have no hesitation

14  "taking out cops" if they interfered with him.  Franey became increasingly agitated

15  during this conversation with Witness 3 and occasionally spoke in what sounded like

16  Arabic phrases.  According to Witness 3, at one point Franey clenched his fists and

17  stated, "I just wish I could get over there [Syria and Iraq].  I would kill everyone."

18       In September 2015, Witness 4 reported an encounter he/she had with Franey.

19  According to Witness 4, Franey asked if he/she was interested in becoming an "ISIS

20  warrior."  Franey said "things were going to happen" and would happen soon.  Franey

21  further told Witness 4 that "we" were going to "be cutting cops' heads off" and there was

22  "going to be anarchy."  Franey further stated that he did not care if he had to sacrifice his

23  life to make things happen.  Franey also asked Witness 4 whether he/she had any

24  weapons and wanted to know what type.  Lastly, Franey told Witness 4 that the "ISIS

25  movement" was going to be taking over and that Witness 4 could have Franey's

26  residence if he "didn't make it."

27       Another associate of Franey's has told the FBI that Franey regularly talks about

28  hating the U.S. Army for not letting him "leave the Army" after he enlisted, and that

COMPLAINT - 6

1  Franey blames the U.S. government for "taking away his kids." According to this

2  individual, Franey regularly espouses his adamant support for ISIS and the Taliban, and

3  talks about his desire to travel to Iraq to join ISIS.

4      Reviews of Franey's known Facebook page at various times during 2015 confirm

5  that Franey is intently focused on radical ideology and ISIL. The various postings on

6  Franey's Facebook page include numerous examples of pro-ISIL and other radical

7  jihadist propaganda.

8      **D. Overview of the Undercover Operation.**

9      Based on the above information and other investigation, the FBI instituted an

10  undercover operation for the purpose of further investigating Franey. The operation

11  utilized one primary undercover officer ("UC1"), who contacted and ultimately

12  befriended Franey. UC1 posed as an individual who was raised as a Christian but who

13  was open to learning more about Islam from Franey. Over time, UC1 revealed to Franey

14  that he (UC1) was an unlawful black market seller of firearms, although this was not

15  known to Franey at the outset of his contacts with UC1. Franey ultimately joined UC1

16  on five staged firearms trafficking delivery trips. Franey acted as a lookout during these

17  trips, and also personally handled firearms on multiple occasions. From time to time,

18  other undercover officers also participated in meetings with Franey. Some of these

19  undercover officers posed as UC1's customers who purchased the firearms.[3]

20      **E. The Initial Meetings Between UC1 and Franey.**

21      The first meeting between Franey and UC1 took place on July 2, 2015, outside of

22  Franey's residence in Montesano. UC1 approached Franey and they struck up a

23  conversation. Within a few minutes, Franey told UC1 that he and his family were

24  Muslim, and shortly thereafter he began extolling the virtues of ISIS. Franey described

25  ISIS as "the best people on earth," and stated, "[A]nyone comes at us and they're against

26

27  [3] The contacts between Franey and the undercover officers were consensually recorded by the officers. The descriptions of the conversations and the quotations used throughout this
28  Complaint are based on preliminary transcripts and/or preliminary reviews of the recordings, and are not meant to be precisely verbatim.

COMPLAINT - 7

the Islamic State, ended up like the people you see on the videos with their head on the ground." They discussed a bow and arrow that UC1 had in his car, and Franey stated that if he wanted to hunt, "that's probably what I gotta use – they don't let us have guns either. Also, I can't travel." Later in the conversation, Franey said he wished ISIS "were right here now. I wish I saw brothers with black flags, walking down the street with AK-47s because I am oppressed." Regarding Osama Bin Laden, Franey opined: "Bin Laden is a diamond. He's a holy warrior. He's a beautiful man." At the end of this conversation, UC1 told Franey that he would be back in the area next week. Franey told UC1, "You're way less ignorant and argumentative than most Americans." UC1 replied, "You show me some facts and I'll look at facts." They agreed to talk again the following week.

The next meeting between Franey and UC1 was on July 8, 2015. During this meeting, Franey showed UC1 various types of ISIL propaganda over a smartphone. Franey told UC1 that he wanted to travel to Mosul, Iraq, but that the U.S. government would not allow him to travel. Franey explicitly stated, "I want to go fight with, alongside ISIS." UC1 told Franey that he made money by "driv[ing] up and down delivering things." UC1 did not specify what it was that he delivered, although he said, "It's not weed [marijuana]." Franey asked, "Is there something I could deliver to make money?" UC1 said Franey could "hang out" with him during a delivery trip. Franey acknowledged that this was "more of a black market kind of thing . . . I am so good with that kind of stuff." UC1 told Franey that he was welcome to join him on a delivery trip, and Franey expressed interest in doing so. At one point, Franey asked whether UC1's business was "too shady for a Muslim to be involved in?" UC1 replied, "In my opinion, it's not shady at all. But I don't know what Muslims, I mean, I don't know what your religious uh –" Franey interceded and said, "As long as you're not killing people or things like that. Selling alcohol or –" UC1 assured Franey that he was not "killing people." Franey replied, "I might drive with you sometime." Later in the conversation, Franey told UC1, "The only thing I really would ever want from you would be for you to

COMPLAINT - 8

1  become a Muslim maybe down the road."  UC1 said he didn't mind talking about it and

2  listening to what Franey had to say about Islam.

3      On July 22, 2015, UC1 visited Franey's residence.  UC1 told Franey that he would

4  be making a delivery trip to California in the near future and asked whether Franey

5  wanted to join him.  Franey replied, "I just wanna see whatever you're doing.  I just

6  wanna chill, I wanna take a trip to California and see what's happening."  Franey later

7  reiterated, "I don't have any issues. . .  I just wanna see what you got going on, 'cause

8  I'm curious if it's something that's permissible.  I need to make a little money."  During

9  this meeting, Franey continued to praise ISIS and again stated that, "The only thing I

10  wanna do is be able to go to Iraq."

11  **F.  Trip to Spokane, Washington on August 3-4, 2015.**

12      On August 3-4, 2015, Franey joined UC1 on a thirteen-hour "delivery" trip to and

13  from Spokane, Washington.  UC1 drove Franey to Spokane in UC1's vehicle.  UC1 did

14  not reveal to Franey what types of items he was delivering until mid-way through the trip.

15  But prior to that, at the beginning of the trip, Franey told UC1 that he "fantasized" that

16  UC1 was a "small arms dealer" because "we need some small arms."  Franey then stated,

17  "Or maybe you're an ISIS connector."  When asked what that meant, Franey replied,

18  "You could connect us to, you could get me . . . transportation arenas where I could be

19  transferred, transported over there."

20      Along the ride – and again before Franey was told what items UC1 was delivering

21  – Franey told UC1 that Joint Base Lewis McChord "would not be safe here anymore" if

22  all of the Muslims in Seattle were "armed with an AK-47 . . . and a black flag."  Franey

23  stated, "That's why we were hoping you were a small arms dealer, man."  Franey further

24  stated, "I just need a .50 cal machine gun, a .50 cal sniper rifle, I need a few dozen AK-

25  47s, some shoulder launch rockets –"  Franey then claimed that it is the "obligation" of

26  Muslims "on the right guidance from Allah" to "fight these soldiers until they stop

27  fighting, until they're dead, or until we're dead.  That is our obligation."  Franey further

28  stated: "For me, it's an interesting deal.  Islam is ISIS.  ISIS is Islam."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    UC1 drove to a store in Tukwila, Washington and parked in the lot.  At that point,

2    another undercover officer delivered to UC1 a bag containing several firearms, including

3    Colt AR-15 assault rifles, Colt M16 assault rifles, Glock pistols, and a Smith & Wesson

4    pistol.  The undercover officers had a brief conversation in front of Franey that – for the

5    first time – revealed they were trafficking firearms.  UC1 and Franey then continued their

6    drive to Spokane, ostensibly to deliver the bag of firearms to UC1's customers.

7    At that point, Franey asked, "How are you guys on AKs, man?"  UC1 replied, "I

8    don't know you good enough, man."  Franey asked UC1 to get him an AK-47 "if

9    someone ever has an extra AK or something you can't use."  Franey then mentioned an

10   unidentified individual who offered to sell Franey multiple AK-47s in the past, but said

11   that he "didn't trust" the guy.  Franey told UC1 multiple times that he wanted a gun "not

12   for an offensive purpose, but for defensive," and explained that he intended to use the

13   gun to kill any "police or soldiers" that came to his house "with guns drawn and tried to

14   separate me from my family."  UC1 repeatedly told Franey that he would not supply him

15   with a gun, especially because Franey had just mentioned wanting to attack Fort Lewis.

16   Franey stated that, "Lewis McChord would just be a little pimple to pop, man.  That's all

17   that is.  Just waiting for the commands of Allah."

18   As they continued their drive to Spokane, Franey and UC1 discussed a variety of

19   types of firearms.  Franey expressed a preference for AK-47s and Glock handguns, but he

20   discussed his past experience with other types of firearms as well, including M-16 and

21   AR-15 assault rifles.  Franey also asked whether UC1 would be able to get ".50 cals" and

22   "a Street Sweeper semi-automatic shotgun."  Franey stated, "If you become Muslim one

23   day . . . then I would say, 'Alright mother effer, I want my Street Sweeper, I want my .50

24   cal.'"  Franey expressed an interest in continuing to assist UC1 with gun trafficking trips

25   by stating, "I'm always in the – looking for a new line of work.  Or a new line of being

26   able to do my family and meet our needs, and certainly weapons is one of our needs

27   because all that's left is for them to come take our, our kids we have."

28

COMPLAINT - 10

1   Franey continued to express his desire to travel to the Middle East to fight jihad
2   with ISIS, and said he could not travel because the government would be waiting for him.
3   UC1 asked, "What would be the crime, though?" Franey replied, "They call it material
4   support to an organization that has been classified deemed a terrorist organization."
5   Franey also told UC1 that he named his daughter "Dawla Islamiyya," which he said
6   means "Islamic State."
7       Franey later told UC1 that prior to this delivery trip, he told his "wife" that he
8   hoped UC1 was "a small arms dealer." He then continued to express interest in obtaining
9   firearms, stating, "Man, I wish I could find someone wanting to get rid of guns." UC1
10  again told Franey, "I'm not giving you nothing, bro." UC1 also expressed a concern that
11  he would be "liable" if supplied guns to Franey, who then used them in an attack at an
12  elementary school or the like. Franey replied, "[Bu]t we don't do elementary schools. . .
13  . We'd free the prisoners. We'd lay down the oppressors." Franey further told UC1:
14  "Well, maybe years will go by and the brothers will never want to do anything, but
15  maybe you'll trust me one day. Just give me one shotgun and one AK. . . . Just for, just
16  for my house."
17      When they arrived in Spokane, UC1 parked in the lot of a hotel. UC1 and Franey
18  entered the lobby of the hotel, with UC1 carrying the bag of firearms. Franey remained
19  in the lobby while UC1 went into one of the hotel rooms to "deliver" the firearms to his
20  "customers." UC1 then returned to the lobby, reunited with Franey, and they returned to
21  UC1's vehicle. Once they were back in the vehicle, UC1 handed Franey a wad of cash
22  and asked him to count it, telling Franey it was supposed to be $10,500. Franey asked
23  UC1 how many M-16's they had delivered, and how many of them were fully automatic.
24  UC1 told Franey that there were eight assault rifles – M-16's and AR-15's – but not all of
25  them were fully automatic. Franey also asked how many 9mm handguns they had
26  delivered, and whether they were all Glocks. UC1 replied that there were eight handguns
27  and confirmed that they were Glocks.
28

COMPLAINT - 11

1    UC1 handed Franey $200 cash and said, "For you."[4]  Franey said he would take

2    the money because he was "broke," but said he felt like he hadn't done anything to help

3    UC1.  UC1 explained that Franey assisted by just being there, and in the future he could

4    be even more helpful by looking out for police officers on the road and at the delivery

5    locations.  Franey said he wanted to be "more useful like, you know, be able to have

6    people that need guns or people that have [] some guns."  UC1 replied that they were "not

7    getting there yet," but that Franey would be helpful by just coming along and serving as a

8    lookout.

9    Franey described UC1's work as follows: "So the service you provide is basically,

10    they're able to get guns without the government knowing."  UC1 added, "And they're

11    able to get guns that they shouldn't be able to get."  Franey replied, "I like that.  That's a

12    good service.  That's something I – I support personally."  UC1 told Franey not to tell

13    anyone about what he did.  Franey replied, "I won't even tell my wife because she would

14    just be excited.  She would be like, "'Oh, where's your gun?'"

15    Franey told UC1, "If I had money, I could keep you guys busy with myself,"

16    referring to purchasing numerous firearms from UC1.  UC1 again told Franey that he was

17    not going to provide him with a gun at this point.  Franey said in response:

18    What you do is a beautiful thing, man. . . . For me, this is good because I
     can't get guns.  I can't go to a pawn shop, a gun shop, a gun show – I can't
19    get guns.  And if I got guns, then the government is going to come to my
     house and kill me.  Literally. . . . I like the idea that if you talk to me for
20    the next five years and eventually I needed a gun, I might get it from you,
21    because I don't have any other – access to guns.

22    Throughout the remainder of the meeting, Franey continued to suggest that he
23    wanted to obtain a firearm from UC1.  For example, he stated that if "I had it sitting in
24    my room, a nice AK-47 . . . I know at least that first goon squad [police] would be put to
25    task.  And they wouldn't even suspect it because if I ever do get a gun, there'd be –
26    through a source like you.  So no one would even know I have it, right?"  Franey also
27

28    [4] In addition to paying Franey for his participation on the "gun trafficking" trips, UC1 also paid
     for Franey's meals and hotel expenses (when applicable) during these trips.

COMPLAINT - 12

1  repeated that in talking with his wife prior to this trip, he told her: "I hope he's [UC1] a

2  Muslim and he's a small arms dealer.  Solve all of our problems."

3      On multiple occasions throughout this meeting, Franey also told UC1 that he knew

4  some other "brothers" who would want to buy guns from UC1, and that with their

5  business UC1 "[c]ould probably run dry in about a month."

6      **G. Meeting on August 20, 2015.**

7      The next meeting between UC1 and Franey took place at Franey's residence on

8  August 20, 2015.  Franey again praised UC1's firearms trafficking work and expressed

9  an interest in further participating in it, stating, "[A]s a profession, what you do, I

10  appreciate what you do.  And I wanna make sure the best that I can that, you know, you

11  get the business and you also stay away from any hard luck that comes."  UC1 told

12  Franey, "If you want, I can use somebody to help me out.  Like to go with me on these

13  trips, to be there to watch for things."  Franey replied, "Yeah. . . . If you're willing to

14  teach me what you do.  And if you trust me that much."  Franey also confirmed that he

15  would "spot the pig, the cops from a distance," describing his role as a lookout.  Franey

16  later asked UC1 whether his customers ever asked to "test-fire" the firearms before they

17  purchased them.  UC1 confirmed that that does happen on occasion.

18      Franey continued to ask UC1 to provide him with a firearm.  Franey stated: "The

19  first thing I would want from you is to be Muslim.  And the second thing I would want is

20  the tools [guns] for my house because . . . we both [Franey and his wife] decided we're

21  not gonna be separated from these kids we have now . . . while we're alive."  Franey later

22  reiterated that he wanted to do "business down the road" with UC1 because, "I'm not

23  afraid of these guys [police] and I don't want to shoot these guys, but at the same time, if

24  they come to my house. . ."  Franey later stated that when UC1 was ready, he wanted to

25  "do some toys," meaning acquiring some guns from UC1.

26      Franey told UC1 that he believed he was "not allowed to have tools [firearms]"

27  due to a 2006 misdemeanor conviction in Alaska, after which he was informed he was

28  not allowed to possess firearms.  Franey explained that they took a DNA swab from him

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and told him that "you have no gun rights now." He stated that a few years later, he tried

2  to obtain a hunting license in Washington State, but was rejected due to this legal

3  prohibition. Franey also added, "I am not allowed to have tools as far as I know, because

4  I am Muslim." Franey later commented, "If this government was an Islamic government

5  . . . I wouldn't need guns. You wouldn't need guns. We wouldn't need nothing, because

6  everybody'd be getting along for each other."

7       At the conclusion of this meeting, Franey asked UC1, "How much would a Street

8  Sweeper be, twelve gauge?" UC1 replied, "Let's talk later." Franey responded, "Alright,

9  get some prices."

10  **H. Trip to Spokane, Washington on September 1-2, 2015.**

11       On September 1-2, 2015, Franey joined UC1 on an overnight "firearms

12  trafficking" trip to and from Spokane. Franey again participated in the role of a

13  "lookout" on this trip.

14       During the drive, Franey espoused at length various radical jihadist views. Among

15  other things, he praised Anwar al-Awlaki[5] as someone who was a "scholar" and "speaks

16  the truth," and he praised a recent terrorist attack in Tennessee, during which an attacker

17  killed five U.S. service members.[6] Franey explained that the Tennessee attacker wanted

18  to fight jihad overseas, but knew he "probably wasn't going to make it," so he decided to

19  attack the military in the United States. Franey described himself feeling the same way:

20  "My opinion on that is: I want to go fight. But I can't. What's the alternative?"

21

22

---

23  [5] Anwar Al-Awlaki was an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula

24  ("AQAP"), a Yemen-based designated foreign terrorist organization that has claimed
    responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea and

25  Yemen since its inception in January 2009. Pursuant to a Presidential Executive Order, Al-
    Awlaki was designed by the United States as a "Specially Designated Global Terrorist" on July

26  12, 2010. Al-Awlaki was reportedly killed in Yemen in September 2011.

27

28  [6] This appears to be a reference to an incident on July 16, 2015, when Muhammad Youssef
    Abdulazeez opened fire on two military installations in Chattanooga, Tennessee, killing five U.S.
    service members and injuring others. Abdulazeez was also killed during the incident.

UNITED STATES ATTORNEY
                                                700 STEWART STREET, SUITE 5220
                                                SEATTLE, WASHINGTON 98101
                                                (206) 553-7970

1    Franey continued to repeatedly ask UC1 for a gun.  For example, he said UC1 was
2  "who I need to know."  UC1 asked, "Why do you need to know me?"  Franey replied,
3  "How else am I going to get guns?"  UC1 again told Franey he was not going to give him
4  a gun, and stated, "If the only reason you're working with me and the only reason you're
5  hanging out with me is so you can get a gun eventually dude, get the f--- out of my car."
6  Franey answered, "Of course that's not it," but he continued to ask for a gun throughout
7  the trip.  Just a few minutes later, Franey said, "The reality is I want one for my house . . .
8  If I'm home next time and ten cops come with their shotguns drawn, they're either going
9  to kill me or they're going to disable me and take my children."

10    UC1 drove to a store in Tukwila, Washington, and parked in the lot.  UC1 entered
11  the store, while Franey remained in the vehicle.  UC1 returned to the vehicle with a bag
12  of firearms that he had received from another undercover officer.   UC1 asked Franey to
13  look in the bag to see what was in there "to make sure it's all good."  Franey looked in
14  the bag and stated, "Seven ARs and four handguns."  Franey later confirmed for UC1 that
15  he "check[ed] to make sure there were no bullets in those guns."  Franey and UC1 then
16  discussed a variety of different types of firearms and Franey expressed his preference for
17  AK-47s and other types of assault rifles.  Franey also asked UC1, "If we needed big
18  orders, we could fill 'em?  I mean, if we had the orders?"

19    Franey also continued to discuss his desire to attack a domestic military target.
20  For example, on September 1st, Franey told UC1: "And you know, honestly, I'll just be
21  honest with you, talk pretty candidly.  To me, I think if there's a unit, you know, from the
22  Marines and the Army getting ready to ship out, they should be hit.  I think if there's the
23  airbase, a command and control center, they should be hit."  Similarly, later in the trip
24  Franey stated:

25        And like I told you, if there was a Marine unit fixing to go out, I would hit
          them. . . .  If the people were in place and the things were in place and this
26        is not going to go, this is not going to de-escalate, this thing's getting
27        bigger.  So maybe it's ten years, maybe it's two days.  If the things were in
          place, whether I learned or not, whether I saw my kids or not, of course I
28        would love to go hit a Marine unit before they went.

COMPLAINT - 15

Franey later continued to discuss attacking a military base, stating: "But with a couple of tools, you'd be very effective. You'd be surprised how effective you'd be against these people, man. . . . And when you pull the trigger, your objective is to drop somebody. I mean, that's the reality. . ."

At various times during this conversation and others, Franey expressed concerns that UC1 was an undercover agent. For example, at one point Franey said he was worried that the government was "trying to get more charges" on him, such as "gun running, trying to acquire weapons." UC1 took offense to the suggestion that he was an undercover agent, and Franey apologized for the accusation. Franey then took the opportunity to ask for another gun: "Hey, even if you don't want to hang out anymore and you don't want to get me my stuff I need, can you at least give me, like, one for her [his wife], one for me, one for the house?"

When UC1 and Franey arrived in Spokane, UC1 parked at a hotel parking lot and went inside the lobby for the "firearms exchange." Franey acted as a lookout, staying in the vehicle. When UC1 returned, he handed Franey cash and asked him to count it. UC1 also paid Franey $500 for his participation on the trip.

UC1 later told Franey: "If this is something you don't want to be a part of, I completely understand. And I wouldn't think badly of you, you know. Taking you away from your family and stuff you know." Franey responded, "Of course, I want to be part of this." Franey later explained why he wanted to participate:

> The only reason I took this money and the money last time, and honestly, I just want you to become Muslim. And if we get to the point where you'd be okay with giving me a gun, of course I want some guns. Not because I want to kill people, but I want some guns. Everyone else got's guns. The cops come to my house with guns. I feel like I should have something, you know?

Franey again asked UC1 whether he could get him a "Street Sweeper shotgun" or "more of a sniper type gun." As before, UC1 indicated he would not be willing to give Franey firearms at this point in their relationship.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### I.   Meeting on September 22, 2015.

UC1 next met with Franey at his residence on September 22, 2015.  Franey told UC1 that he "asked someone the other day" about buying five AK-47s, and that he was quoted a very low price.  Franey expressed suspicion that the guns were either not functional or that it was "a set up."  Franey again asked UC1 for a firearm "for the house."  He assured UC1 that it would not be a gun "I would take out, I just don't want to make it easy for 'em when they come."  Later in the conversation, UC1 said: "I know that you're paranoid, I know what you want.  You want a Street Sweeper and you want an AK.  I got it."  Franey replied, "Yeah, just for the house."  Franey also acknowledged, "You don't want to give me guns yet. . . . I'm good with it."  Franey later commented, "I don't need anything right now."  During the remainder of the conversation, Franey discussed various aspects of his radical beliefs.  Franey also commented: "Like I said, a year from now, if I'm dead or in prison, that wouldn't be a shock.  You know what I mean?"

### J.   Trip to Ellensburg, Washington on September 28, 2015.

On September 28, 2015, Franey joined UC1 on a twelve-hour trip to and from Ellensburg, Washington, with the understanding that he was assisting as a lookout while UC1 was delivering firearms to another customer.  At the beginning of the trip, UC1 again told Franey that it was okay if Franey did not want to continue working with him. Franey reaffirmed that he was interested in working with UC1, stating, "What I want is an army of guys with guns that have a like mind."  UC1 said he has a group like that, but they were not familiar with the ideologies that Franey discussed.  Franey suggested that if they learned about Islam, they may be willing to participate.  Later in the conversation, UC1 again asked if Franey wanted to continue assisting with firearms trafficking, and Franey responded: "As far as running tools around, I have no issues with that."

As they were driving on Interstate-5, they passed by Joint Base Lewis-McChord. Franey said, "Here's the place."  UC1 commented that it seemed like a very difficult target.  Franey responded, "It's like a kickoff . . . everyone runs down the field and du-

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    du-du-du-du-du," imitating machinegun fire.  Franey further stated that he could "get

2    maps" and they are not "ready for a battle . . . these guys here."

3         As in past conversations, Franey discussed his desire to travel to the Middle East,

4    but acknowledged he would not be able to get there.  Franey said his first preference

5    would be to leave the country with his family, and his second preference would be to

6    leave by himself.  He further said that he does not "have a grand scenario," but that he

7    has an obligation to "free the prisoners" as they do in the Islamic State.  Franey later

8    stated, "The battleground is over there, but if you can't get there, you know . . ."

9         During this trip, Franey again asked for a gun from UC1.  For example, at the

10   beginning of the trip Franey told UC1, "I wouldn't mind having something for my

11   house."  Franey also said he was going to visit two other guys "on the down low" to see

12   "if they have any tools for myself."  Franey said he asked around and was told that one of

13   the guys had AK-47s and could "get tools."

14   UC1 and Franey arrived at a store in Tukwila, Washington.  UC1 parked his vehicle

15   in the parking lot.  A few moments later, another undercover officer entered the rear seat

16   of UC1's vehicle, and delivered a duffel bag containing several .40 caliber handguns.

17   The other undercover officer unzipped the bag, while Franey and UC1 turned around and

18   watched from the front seats.  Franey asked if there were "a dozen handguns?"  UC1 said,

19   "You can look at them."  UC1 removed a Glock Model 22 .40 caliber pistol (serial

20   number KMD480) from the bag and told Franey, "That's the one you thought . . . last

21   time, remember you thought it was heavy?  Feel that, it's not heavy."  UC1 handed the

22   Glock 22 to Franey, who took possession of it and stated, "That feels quite a bit lighter."

23   Franey also commented that the Glock 22 was not well balanced because it did not have a

24   magazine in the receiver.  Franey then handed the Glock 22 back to UC1, who placed it

25   in the duffel bag.  UC1 then removed a Glock Model 23 .40 caliber pistol (serial number

26   KHZ682) from the bag and said, "That one's got a nice grip on it, too."  UC1 handed the

27   Glock 23 to Franey, who took possession of it and commented that it had a magazine in

28   the receiver.  Franey continued to handle and inspect the Glock 23, and then gave it back

COMPLAINT - 18

1    to UC1, who returned it to the bag and zipped the bag closed.  During this conversation,

2    Franey also asked if all of the handguns were ".40's," and UC1 replied, "They should

3    be."  Franey said, "I guess handguns are good if you're close."  Franey also stated, "It

4    would be nice to have a handgun."

5        UC1 and Franey then continued the drive to Ellensburg.  During the drive, Franey

6    mentioned a Street Sweeper assault rifle and commented, "I guess full auto would be a

7    trip, too."  UC1 asked Franey, "An AK, what did you want with an AK?"  Franey said he

8    doesn't "need full auto," but after talking about it with UC1, and having "shot full auto

9    before," a full auto version "would have its purpose."

10       When they arrived in Ellensburg, UC1 parked in the lot of a hotel.  UC1 and Franey

11   entered the lobby of the hotel.  Franey stayed in the lobby (UC1 had asked him to "stay in

12   the lobby and look around") while UC1 delivered the bag of guns to another undercover

13   officer in a hotel room.  After the delivery, UC1 and Franey got back into UC1's vehicle,

14   and UC1 paid Franey $100 for his participation in the "delivery."[7]

15       As they drove back, Franey mentioned a mosque that was "loaded with soldiers,

16   loaded with the best brothers," and where he was not suspicious of the "feds" being in

17   there.  Franey described it as "a beast, a lion of a mosque."  Franey said there were a lot

18   of people at this mosque who "wanted to go fight" and would say, "put us on a plane, put

19   us in the game."  UC1 said he did not want to go to a mosque.  Franey said he

20   understood, but maybe one day if UC1 wanted to go to a mosque, this would be the one

21   to visit.  Throughout the conversation, UC1 and Franey discussed the possibility of

22   getting UC1's "people" together with Franey's "brothers."  UC1 suggested that his

23   people may be open to learning from Franey about his ideologies and if they agreed, they

24   would potentially join Franey in the type of "fight" he was envisioning.

25

26   _____

27   [7] On September 22, 2015, UC1 provided Franey with $300 cash after Franey discussed his
     financial hardships.  At that time, UC1 told Franey that he would take the $300 "out of" Franey's
28   payment for the upcoming September 28th firearms delivery trip.  Therefore, Franey was paid a
     total of $400 for his participation on this trip.

COMPLAINT - 19

1       Later in the conversation, Franey told UC1: "If, say, a year from now if we still

2   hang out . . . if I ever got stuff [firearms] from you, I can get it direct and I can take it to

3   these people . . . I'd probably be using my money, just to get the weapons, the tools, for

4   these people." Franey further stated, "The time when I, if I ever get these tools, that's

5   when things get serious, because I don't care if the cops come to my house now, what are

6   they gonna do? Now if I have guns, then the fight's gonna have to happen. . . . Once I

7   have guns, that's the only option. . . I'm gonna have one chambered, and as soon as I can

8   see one . . ."

9   **K. Meeting on October 15, 2015.**

10       On October 15, 2015, UC1 met with Franey at his residence in Montesano. During

11   this meeting, UC1 told Franey that he was planning a trip to California, and asked if

12   Franey would like to come along to "help out." Franey confirmed that he wanted to do

13   so. As UC1 was leaving Franey's residence, Franey walked outside with him to his

14   vehicle. Another vehicle drove by, and Franey told UC1 the occupants were good guys.

15   Franey said, "They like guns and they have guns. And they're allowed to." Franey then

16   said, "I don't even like guns. And I'm not allowed to have them. But I want 'em."

17   **L. Trip to Southern California on October 26-29, 2015.**

18       On October 26-29, 2015, Franey joined UC1 on a four-day "firearms trafficking"

19   trip to and from Santa Monica, California. Franey again agreed to assist in the role of a

20   "lookout" on this trip.

21       On October 26, 2015, Franey met UC1 in Olympia, Washington. Franey entered

22   UC1's vehicle and they began driving south on Interstate-5. Prior to meeting with

23   Franey, UC1 placed a duffel bag of firearms on the back rear floorboard of the vehicle.

24   Among other firearms, the bag contained a fully automatic AK-47 style Romarm-Cugir

25   Model PM-65 7.62 x 39 mm assault rifle (serial number 1979- ZG3795). At

26   approximately 9:52 a.m., UC1 commented that Franey would like one of the firearms in

27   the bag, and told Franey that he could look at them. Franey turned around in his seat,

28   reached out to the duffel bag, and unzipped it. Franey exclaimed, "Oh yeah," and

COMPLAINT - 20

1  removed the above-referenced AK-47.  UC1 explained that it "took forever to get that
2  because they wanted full auto."  As Franey held the gun, he commented that "it's heavy."
3  Franey attempted to manipulate the collapsible stock and asked, "Does that flip out and
4  make a stock?"  Franey also asked UC1 what his customer was going to use the AK-47
5  for.  Franey ultimately returned the AK-47 back to the bag and zipped it closed.  Franey
6  commented that he didn't really want a fully automatic weapon for himself, but thought
7  they would be most useful over in the Islamic State.  UC1 explained that the firearm can
8  be switched between fully automatic and semi-automatic.  Franey replied, "The selector
9  switch, yeah.  That'd be nice to have as an option."

10  Later that day, Franey asked UC1, "What's the AK run?"  UC1 said he was going to
11  sell it for $2,500-$3,000.  Franey commented that it was expensive because it was fully
12  automatic.  Franey then asked whether the AR-15's would sell for $1,000.  UC1 said he
13  would sell those for $2,000-$2,500 because they were also fully automatic.  Franey
14  asked, "How much less if they don't have the auto option?"  UC1 replied, "Probably a
15  thousand, depending what they have on them."  Franey then asked how much it cost to
16  convert them to fully automatic.  UC1 says he doesn't do that, and a customer would
17  have to do that on their own.  Franey asked if UC1 "gets them that way [fully automatic]"
18  and UC1 confirmed that he did.

19  During the drive on October 26th, Franey continued to discuss his affinity for ISIS
20  and his frustration at the U.S. government.  Franey said he hoped the "cops" would agree
21  to "step off" and lay down their guns so "we're gonna deal with a few judges, and deal
22  with a few bankers, and deal with a few politicians and D.A.s . . . the Secretary of
23  Defense."  Franey continued by saying, "They can stop, or it's gonna be a battle.  And
24  even though it won't look like we're gonna win, the Islamic State will still win."  Franey
25  further stated, "I've never killed anybody, and I don't want to have to go and kill a bunch
26  of people."
27  //
28  //

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Later in the conversation, UC1 asked Franey whether, if he (UC1) became a
2  Muslim, it would be his duty to either "go to Syria or try to do something here?" Franey
3  replied: "I'm working feverishly at trying to go to Syria, or do something here. And if I
4  do something here, literally, yes. All you people that work for this government and you
5  carry weapons and you don't even know your own laws and the ones you know you don't
6  like and so on, piss off!" UC1 said that what he has understood from Franey is that, if he
7  (UC1) became a Muslim, he would either have to go to Syria or "do something here to
8  fight oppression . . . and from the sounds of it, it has to be some kind of aggressive
9  assault or attack or something." Franey replied, "Yeah." UC1 clarified that Franey was
10  saying that, as a Muslim, he would "have to do one of these two things based upon []
11  faith . . . because it's part of your religion." Franey replied, "It is." Franey further opined
12  that Allah would still love a Muslim who did not migrate or fight, "*but*, you will not be
13  regarded as a strong Muslim in the eyes of Allah, and you will not be given this station in
14  paradise . . . that you would be given if you migrated. . . . You would be given a much
15  higher status, much more loved. And if you went there to fight, even more so." Franey
16  described a Muslim who did not migrate or fight as a "weaker one . . . a coconut
17  Muslim."

18    The following morning, on October 27, 2015, UC1 and Franey drove from Redding
19  to Santa Monica, California, in order to "deliver" the firearms. They went to an
20  apartment where UC1 and Franey met with four other undercover officers ("UCs") who
21  were posing as UC1's customers. UC1 delivered the bag of firearms to one of the other
22  UCs, and they briefly discussed the number of guns, the types, and the price. UC1 was
23  provided cash for the guns, and he counted it in Franey's presence.

24    While at the apartment, Franey spoke with a few undercover officers ("UCs")
25  outside the presence of UC1. One of the UCs asked Franey whether he "did anything
26  wrong today" by delivering the firearms. Franey responded that "in the government's
27  opinion" he did do something wrong because "I know I can't have 'em," referring to the
28  fact that he was not lawfully allowed to possess firearms. Franey later said:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

I don't even want tools unless I am very shortly gonna use them. I don't
need those in my life, until I need them, at this point. They would just be a
liability right now for me. You know what I mean? Now, do I want 'em?
Yeah, he [UC1] knows what I've mentioned to him. Street Sweeper
shotgun, 25 rounds in the clip, a couple of those, just for starters. . . . I've
mentioned it to him. . . . I told him if I have money, you know. . . when I
have money. . . . I put in my request, I said this is what I need, you know.
Because I already had a list in my head before I met this guy, right? For
my own arms that I'm getting. . . . For my house and for me.

In response, one of the UCs asked, "Why don't you just go buy one?" Franey replied, "I
can't have guns. . . . I can't have guns on, like, three levels, man."

During the conversation with the UCs, Franey also expressed many of his pro-ISIL
and radical beliefs  For example, Franey stated, "Any government agents that I'm around,
I feel the duty to kill."  Franey later explained:

It's just not possible for me to have any kind of non-murderous relationship
with these people. Because they are not gonna stop, and they are not gonna
give me my kids in any other way. And I'm not a violent person. . . . I
don't really want to take people's lives. I don't feel like this is a position
that I'm in. But, because of the times we live in, and because of what's
happening, as a citizen of this earth, as a human being, it's a hundred
percent obligation. And, as a Muslim, it's a hundred percent obligation.

One of the UCs commented that he has "the things" (firearms) for when the
government comes for him. Franey interrupted and said, "But you don't want to be
active." Franey then continued: "I understand. And, I don't want to be active unless I
could be there [Middle East], and I can't right now. So to be active here, would be to be
at my house, and if they came, to give them whatever hell I could." Franey again stated
that he wanted to get a firearm to use at his house for when the government came for him.
Later in the conversation, Franey made several additional comments regarding ISIS and
his radical ideology, including: "I am scarier to the government than you guys. . . . I'm
an ISIS guy. I know ISIS guys;" and "I'm an ISIS soldier. . . . I consider myself an ISIS
soldier as much as the brothers over there."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        The next morning, on October 28, 2015, UC1 and Franey drove back to Redding,

2   California.  During the drive, Franey told UC1 that he wouldn't take offense if UC1 did

3   not want to take him on any future gun delivery trips.  UC1 told Franey that it helped him

4   to have a "second pair of eyes" being watchful for "cops" and "things that look weird."

5   Franey replied, "I feel no risk from this to me, as long as we're all as we seem," meaning

6   that UC1 was not an undercover officer.[8]  Franey continued by stating, "And I don't fear,

7   like, this is a bad thing or something that Allah might be in trouble with.  This is . . . I

8   mean, I was already actively trying to do it," referring to his prior independent efforts to

9   acquire firearms.  Franey explained that "besides that guy who has the five AKs," he also

10  knows a guy who is "connected with some Russians" who Franey is trying to meet up

11  with.  A few minutes later, Franey asked whether UC1 had a source for bullets.  UC1

12  responded that he can most likely get ammunition.

13       UC1 asked Franey what his wife thought about the prospect of Franey "being dead

14  or in jail soon" because of his perceived "duty."  Franey said his wife also wanted to go

15  to the Islamic State, but realizes "it's not realistic to move our family there."  Franey

16  further stated, "As far as staying here and fighting, she's seeing it like, that might be

17  more of a reality, because how are we – you know?  And she's looking at the same stuff

18  I'm looking at in society, with the people, and with the Muslims, and like I said, the cop

19  stuff. . . ."  Franey said he would be "fine" if he knew "I'll be able to do something here."

20  Franey further commented, "The Muslim environment that I know – and you guys – I

21  mean, it's just a matter of time at this point."

22       Franey said one of the other UCs had told him it would be nice if they could find a

23  "non-violent resolution."  Franey said he agreed with that, but asked, "What would that

24  even be?"  Franey told UC1: "I don't want to kill people.  I hope I don't come off like

25

26      

27  [8] As noted above, on numerous occasions throughout their contacts, Franey expressed the
concern that UC1 was a "fed" or an "undercover."  This is something Franey repeatedly
discussed.  For example, on October 27, 2015, one of the undercover officers in Santa Monica

28  patted down Franey upon first meeting him.  In response, Franey told the UC that if he had not
patted him down, Franey would have concluded the UC was a FBI or CIA agent.

COMPLAINT - 24

someone that just wants to kill people." UC1 replied, "No, you don't . . . But to me it sounds like you're going to [commit a violent act] at some point, dude." Franey replied, "What's the other resolution?"   Franey further stated, "It would be absurd to think I wasn't going to do something eventually. . . . But it doesn't matter, I mean, if they take me out or anyone out, it's not gonna change the outcome. . . . But, I wanna be in on that, if I can."

Later in the conversation, Franey stated:

> I don't want to do anything until Allah has the time decreed. But I'm just looking at this from a completely serious point of view. There's a lot of people involved. And there's a lot of risk involved. But there are necessary preparations being made. . . . And so, I've always been waiting for this, right? And, I would like to go to Syria, but that's so farfetched, you know? And I know this is gonna be a tumultuous spot one day. And so, maybe that day is coming in ten years or something. So, there is a lot of work to do.

UC1 told Franey that it sounded like he was the type of person who was going to commit an "offensive" attack of some sort. In response, Franey stated: "I don't feel in a position, if I went and did something like you're saying – 'lone wolf' or whatever they call it – I don't know certainly that God is gonna accept me." Franey further explained, "If I knew that Allah would accept, yeah, we would attack. But I'm afraid of Allah. And I know Allah's plans are much better. So if I'm like, 'I'm gonna go take out the Olympia police' or something, it's like, maybe Allah has a much better idea." Franey later stated, "The only reason, like I said, I'm not doing anything is I don't have that level of iman, that faith, that god is . . . But at the same time, we're sitting in this truck. . . I couldn't have foreseen that six months ago. . . . I'm saying, God's putting things in motion."

During the drive, UC1 told Franey that he was planning another trip to Eastern Washington in a couple weeks to "shoot [firearms] with those guys," and invited Franey to come along. Franey replied, "I would like to." Later in the conversation, Franey told UC1, "Even if I never get a tool from you, I can go these other avenues," referring to the previously mentioned individuals from whom he hopes to acquire firearms.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    As they were approaching Redding, UC1 offered to pay Franey for his
2    participation on the delivery trip.  Franey said he did not want to take money for this trip,
3    because UC1 had done so much for him already, and "I'm not doing this for money."
4    Franey also said that if they take another trip in the future, he may ask for money.  UC1
5    commented that Franey seemed to have an interest in "working" and "doing what I do"
6    (gun trafficking), and Franey replied, "Oh, absolutely."
7    On October 29, 2015, UC1 and Franey drove back to Western Washington.
8    Towards the beginning of the drive, Franey asked UC1 whether one of the UCs to whom
9    they delivered the guns had said he "doesn't like the M-16."  UC1 said he liked the M-16,
10   but he was "really stoked about that other one [the AK-47]. . . . They're hard to get."
11   Later, UC1 referenced the large amount of cash they had in the vehicle from the gun
12   transaction, and Franey replied, "I don't like having big piles of money.   It makes me
13   more nervous than the . . . you know, the guns."
14   Later in the day, Franey again referenced the individuals he knew from whom he
15   may be able to obtain firearms.  UC1 warned Franey to be careful, and said if anything
16   were to happen to Franey, UC1 would feel "horrible – really really bad."  Franey assured
17   UC1, "I knew of these three people, three different groups or whatever you want to say –
18   two different individuals and a group – before I met you, and I was gonna visit 'em
19   anyway.  Just to see. . . .  The group I feel most comfortable with is the Russians."
20   Franey later asked UC1:  "Hypothetical question: Say I had money one day and you had
21   a Street Sweeper shotgun, what do you think it'd run?"  UC1 said he would probably give
22   it to Franey for what it cost him, but said he would have to ask around.  Franey said, "For
23   home protection.  You know, if they raided me."
24   **M. Trip to Yakima, Washington on November 12-13, 2015.**
25   On November 12-13, 2015, Franey and UC1 went on an overnight firearms delivery
26   trip to Yakima County, Washington.  The trip started on November 12, 2015, when
27   Franey met UC1 in the parking lot of a store in Lacey, Washington.  They then drove to
28   the Yakima area in UC1's vehicle.

COMPLAINT - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Prior to meeting with Franey, UC1 had placed a duffel bag containing several
2  firearms on the rear floorboard of his vehicle.  Included amongst the various firearms
3  were a fully automatic Colt Model AR-15 5.56 mm assault rifle (serial number 4378629)
4  and a fully automatic AK-47 style Romarm-Cugir Model PM-65 7.62 x 39 mm assault
5  rifle (serial number 1979-ZG2045).  At approximately 10:44 a.m., while driving
6  southbound on Interstate-5, UC1 and Franey began discussing the firearms that were in
7  the bag.  UC1 told Franey there was "a new one" he found that his customers wanted
8  (referring to the AR-15), and an AK-47 that Franey could shoot later that day if he
9  wanted to.  Franey responded, "Okay."  Franey then asked, "How much – you said like
10  three grand?"  UC1 confirmed that he was going to try and sell the AK-47 for $3,000.  At
11  that point, Franey turned around, reached into the back seat area, and began unzipping the
12  bag.  As he was doing so, Franey asked, "What's the one they're all excited about
13  trying?"  UC1 described the AR-15 as being lighter and having a carbine, a shorter barrel,
14  and a classical stock.  UC1 asked, "You see 'em?" referring to the AR-15 and the AK-47.
15  Franey then took possession of the AK-47, and partially removed it from the bag.  UC1
16  said that the AK-47 was "the same kind as the last one, but it's a little more beat-up."  As
17  Franey handled the AK-47, he stated, "yeah, a little older" and commented that part of
18  the firearm was worn.  UC1 and Franey discussed that the AK-47 was capable of firing
19  either fully-automatic or semi-automatic.  Franey moved the selector switch through the
20  various available positions (fully-automatic, semi-automatic, and safe).  Franey then
21  placed the AK-47 back in the bag and zipped it closed.  At various other times during the
22  drive, Franey asked UC1 questions about the firearms in the bag and the prices they
23  would sell for.
24  UC1 and Franey arrived at a campground in Naches, Washington (Yakima County).
25  As they drove into the campground, Franey stated: "Do they let you come out and shoot
26  guns in a National Park?  For me, I know the rules are no guns, no bullets, no shooting,
27  no thinking about it."  UC1 and Franey then met up with other undercover officers at the
28

COMPLAINT - 27

1  campground. UC1 commented that the place was "hard to find." One of the other UCs
2  replied, "That's the whole purpose."

3      UC1, Franey, and another undercover officer departed the campground in UC1's
4  vehicle and drove to a nearby clearing, where they were met by the other UCs who rode
5  in a separate vehicle. UC1 removed the bag of firearms from his vehicle, and placed it on
6  the tailgate area of the vehicle. One of the UCs removed the AR-15 assault rifle (serial
7  number 4378629) from the bag, loaded it with ammunition, and began firing it. Franey
8  was standing nearby and was watching. One of the UCs then asked Franey whether he
9  wanted to fire the AR-15. Franey took possession of the AR-15 and fired it several times.
10  Franey commented that the AR-15 "didn't lock back" after he fired it the last time. A
11  few minutes later, UC1 provided Franey with the AK-47 (serial number ZG2045), and
12  Franey fired it in the fully automatic mode. UC1 then approached Franey to take back
13  the AK-47, but Franey asked to shoot it in the semi-automatic mode. The UCs explained
14  to Franey how he could transition the AK-47 to fire semi-automatic, and Franey then
15  manipulated the selector switch and fired the rifle in the semi-automatic mode. After
16  firing the AK-47, Franey stated, "Honestly, I haven't fired a gun in probably six years."
17  Franey then provided the AK-47 to UC1, who secured all of the firearms back in the bag
18  and returned the bag to his vehicle. One of the UCs surreptitiously videotaped the
19  portion of the meeting when Franey was firing the above-referenced firearms.

20      Franey, UC1, and the other UCs then drove back to the campground, where they
21  spent the night. As they were driving back to the campground, UC1 asked if Franey had
22  noticed the differences between the AK-47 and the AR-15. Franey replied, "Yeah," and
23  commented that the guns were "shooting low because they were sighted for farther than
24  thirty feet." UC1 asked Franey which gun he preferred shooting. Franey said he
25  preferred the AR-15, and commented on "the pistol grip," the "carbine," and that it uses a
26  "bigger round." A few minutes later, Franey said, "It's been seven-eight years since I've
27  shot a gun. A dry spell. I don't want 'em around me until I need 'em. . . . I would have
28  'em around me if I could." In Franey's presence, UC1 and another undercover officer

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  negotiated the price for the sale of both the AK-47 and AR-15, and agreed on a price of

2  $5,500 for both.

3        Throughout the afternoon and night at the campground, Franey discussed a variety

4  of topics with the UCs, including his beliefs regarding ISIL and his radical ideologies.

5  For example, in discussing the Muslim uprising Franey had previously referenced, he

6  suggested telling all of the Sherriff's Offices not to "come to work tomorrow . . . don't

7  fucking come on duty."  Franey continued:

8        The easiest, most non-violent way would be to go and say, "Hey, here's the
         ultimatum.  You guys fuck off tomorrow, or we'll kill you."  And as soon
9        as the sun comes up, any of those mother fuckers that come, you shoot 'em.
         And then you're on to the troops just like that.  Because the cops are the
10       first things that's gotta go.  I mean, they either gotta go or they gotta go. . .
11       . This is a mercy offering right now. . . .  As soon as the sun rises, if they
         come in a uniform, they come with a gun, you shoot 'em, fuck 'em! . . .
12       Then you go to the military bases, you go to the Air Force bases.  You say,
         "Look, you guys are done."
13

14       Franey later commented, "I don't think anyone wants to kill people . . . but the

15  reality of what has to happen is in front of us."  Franey explained: "I've been at this point

16  for a long time. . . .  I just don't know what I would be waiting for at this point."  Franey

17  also referred to himself as "just one guy with a knife."

18       Later that night, UC1 suggested to Franey that they should eat breakfast in the

19  morning and then immediately drive back to Western Washington.  Franey suggested that

20  they "go pop off a couple dozen rounds" prior to leaving.  UC1 replied, "We'll see."

21  Franey said, "It was nice. . . .  It felt awkward at first just standing there holding a gun."

22  UC1 again asked whether Franey preferred firing the AK-47 or the AR-15.  Franey

23  replied, "If they shoot straight, you know what I mean.  I want a scope and I want it to

24  shoot straight.  I guess whatever has more rounds around, whatever stays clean, you

25  know.  It [the AK-47] probably is just sentimental."  Franey later alluded to wanting to

26  get a firearm from UC1, and assured him and the other UCs that he was not going to "kill

27  any women or babies."  UC1 replied, "Maybe in a while . . ."  Franey acknowledged, "I

28

COMPLAINT - 29

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    know man, I gotta go visit those guys and find out about the money, their intentions and

2    whatnot."

3        The next morning, on November 13, 2015, UC1 and Franey drove back to Western

4    Washington.  During the drive, Franey referenced the other undercover officers and

5    stated: "I just hope they become Muslim, because this will really help.  And they already

6    look like the guys over there fighting [ISIL], so it's not like it's a hard transition. . . .

7    They would be ideal candidates for soldiers, you know?  I mean, this is the idea – they

8    become Muslim, you know, and they're already there."

9        Later in the conversation, Franey asked UC1 whether it has "gotten harder to get

10   guns."  UC1 answered that it wasn't hard to get the "AR type," but that AK-47s or

11   "anything fully automatic" were really hard to get.  Franey said it used to be easier to get

12   semi-automatic AK-47's in large shipments about ten or twenty years ago.

13       UC1 paid Franey $500 cash for his participation on this "delivery" trip.

14       **N.  Franey's Continuing Activities Through January 2016.**

15       After the firearms delivery trip on November 12-13, 2015, Franey continued to have

16   contacts with UC1 and other undercover officers, including multiple in-person meetings,

17   phone calls, and text message exchanges.   During these contacts, Franey continued to

18   make persistent efforts to obtain firearms from UC1, as he had during their prior

19   interactions.  Moreover, during these contacts Franey consistently discussed his stated

20   motives for obtaining the firearms and what he wants to use them for, specifically, among

21   other things, to kill federal and local law enforcement officers and to conduct a potential

22   attack against a U.S. military facility.  Franey also twice visited a hardware store in

23   Aberdeen, Washington, where he viewed firearm ammunition, firearm rifle scopes, and

24   airsoft pistols/rifles; and he went to the non-operational Satsop Nuclear Power Plant

25   where he had a suspicious encounter with an employee at the facility.

26   //

27   //

28   //

COMPLAINT - 30

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**O. Interstate Nexus of Firearms.**

Two Special Agents who are certified as Interstate Nexus Firearm and Ammunition Experts with the Bureau of Alcohol, Tobacco, and Firearms collectively have inspected all of the firearms referenced in Counts 1, 2, and 4 above, and have determined that none of the firearms were manufactured in the State of Washington. As a result, all of the firearms must have travelled in, and thereby affected, interstate or foreign commerce, in order to be received or possessed in the State of Washington. These Special Agents have further determined that each of the firearms referenced in Counts 3 and 5 are fully automatic and meet the definition of "machinegun" provided in Title 18, United States Code, Section 921(a)(23), and Title 26, United States Code, Section 5845(b), because they are designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

**P. Conclusion.**

Based upon the foregoing and my training and experience, I respectfully submit there is probable cause to believe that Daniel Seth Franey committed the offenses set forth above in this Complaint.

Joseph C. Deaver
Special Agent, Federal Protective Service

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence this 5th day of February 2016, the Court hereby finds that there is probable cause to believe the defendant committed the offenses set forth in the Complaint.

Karen L. Strombom
United States Magistrate Judge

COMPLAINT - 31